**BROOKHILL–WILK 1, L.L.C., Plaintiff,**

v.

**INTUITIVE SURGICAL, INC., Defendant.**

No. 00 CIV. 6599(NRB).

United States District Court, S.D. New York.

Nov. 8, 2001.

Peter L. Berger, Levisohn, Lerner, Berger & Langsam, New York City, for plaintiff.

John B. Pegram, Fish & Richardson, P.C., New York City, for defendant.

## MEMORANDUM AND ORDER

BUCHWALD, District Judge.

Plaintiff Brookhill–Wilk 1, LLC ("Brookhill") brings this suit against Intuitive Surgical, Inc. ("Intuitive") for patent infringement. Following discovery, Intuitive moved before the Court for summary adjudication of the meaning of potentially dispositive claim language from the patent at issue, U.S. Patent No. 5,217,003 (the "'003 patent"). Intuitive also moved for summary judgment of invalidity of the '003 patent.

Herein, we construe, as a matter of law, the meaning of the relevant language used in the '003 patent. Our interpretation of the '003 patent, combined with the undisputed facts of this case lead us to the conclusion that Intuitive did *not* infringe the '003 patent. Therefore, we grant summary judgment on the entire case to Intuitive and dismiss Brookhill's complaint. Given this conclusion, we need not and do not reach the question of the validity of the '003 patent.

## I. BACKGROUND

In 1991, Peter J. Wilk, the predecessor-in-interest to Brookhill, filed a patent application with the United States Patent Office, and in 1993, he was granted the '003 patent for his "Automatic Surgical System and Apparatus." Intuitive's Statement of Material Facts in Support of Motion ("Def.'s Statement") at ¶ 1. The '003 patent is a system and method that incorporates computers, robotic surgical tools,

and a telecommunications link to allow a surgeon to operate from a "remote location beyond a range of direct manual contact" with the patient. '003 patent, col. 4, lines 17–18. The "objects" of the system, according to the text of the '003 patent, are, *inter alia,* to "reduce[ ] surgical costs" and to "facilitate[ ] the performance of operations by surgeons from all over the world." *Id.,* col. 1, lines 41, 46–48. The Abstract of the '003 patent offers a more complete description:

> A surgical system comprises an endoscopic instrument, a camera on the endoscopic instrument for obtaining video images of internal body tissues inside a patient's body via the endoscopic instrument, and a transmitter operatively connected to the camera for transmitting, over a telecommunications link to a remote location beyond a range of direct manual contact with the patient's body, a video signal encoding the video image. A receiver is provided for receiving actuator control signals from the remote location via the telecommunications link. The receiver feeds the signals to a robot actuator mechanism for controlling that mechanism to operate a surgical instrument insertable into the patient's body.

Mr. Wilk later filed a second patent application as a "continuation-in-part" of the application which led to the '003 patent. Def.'s Statement at ¶ 3. This second application eventually issued as U.S. Patent No. 5,368,015 ("the '015 patent"). *Id.*

In 1995, Intuitive was founded with the purpose of developing FDA-approved robotic surgery devices. Defendant's Memorandum in Support of Its Motions for Summary Adjudication or Summary Judgment ("Def.'s Mem.") at 1. By 1997, Intuitive had created a working prototype of the surgical system that would eventually develop into the *da Vinci* system. *See* Intuitive Surgical *at* http://www.intu-surg.com/html/news/news97c.html (last modified September 21, 2001). The *da Vinci* system consists of several components which "translate" the movements of a surgeon's hand into "micro-movements" of robotic instruments placed inside the patient via small incisions. Def.'s Mem. at 2.

Brookhill, the entity to which Mr. Wilk transferred ownership of the '003 and '015 patents, brought suit in this Court against Intuitive alleging that the *da Vinci* system infringes both of those patents. Compl. at 2. Subsequently, the parties entered into a stipulation which dismissed all claims and counter-claims with respect to the '015 patent. *See* Stipulated Dismissal dated July 31, 2001. Thus, only the '003 patent remains at issue in this litigation.

## II. DISCUSSION

In its motion, Intuitive asserts that the term "remote location," as used in the '003 patent, means "a location outside the operating room." Def.'s Mem. at 4. Alternatively, Intuitive argues that the '003 patent is invalid due to a violation of the patent statutes. *Id.* at 4, 13. As explained below, if the Court agrees with either proposition, the complaint must be dismissed. Brookhill has attempted to persuade the Court that "remote location" need not be a location outside the operating room, and that the '003 patent is, in fact, valid. Plaintiff's Memorandum in Opposition to Defendant's Motions for Summary Adjudication or Summary Judgment ("Pl.'s Opp.") at 6, 19.

For the reasons that follow, we find, as a matter of law, that "remote location beyond a range of direct manual contact," as used in the '003 patent, means "a location outside the operating room where the patient undergoing surgery is located." As it is undisputed that a surgeon using the *da Vinci* system is located within the same operating room as the patient, we further

find that the *da Vinci* system does not infringe the '003 patent. On this basis, we grant summary judgment on the entire case to Intuitive. Given this conclusion, we decline to pass on the validity of the '003 patent.

### A. Standard on Summary Judgment for Noninfringement

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also, e.g., Rothe Dev. Corp. v. United States Dep't of Def.,* 262 F.3d 1306 (Fed.Cir.2001). For the purposes of summary judgment, all factual inferences are resolved in favor of the non-movant, in this case, Brookhill. *Transco Prods. Inc. v. Performance Contracting, Inc.,* 38 F.3d 551, 555 (Fed.Cir.1994).

The Federal Circuit has laid down a two-step analytical approach to determine whether a patent claim has been infringed. *Interactive Gift Express, Inc. v. Compuserve Inc.,* 256 F.3d 1323, 1330 (Fed.Cir. 2001) (citing *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.,* 15 F.3d 1573, 1576 (Fed. Cir.1993)). First, the patent claims that are allegedly infringed, those of the '003 patent, must be properly construed to determine their meaning and scope. *Carroll Touch,* 15 F.3d at 1576. Second, these claims, properly construed, must be compared to the accused device or process, the *da Vinci* system. *Id.*

Here, no relevant facts regarding the *da Vinci* system are in dispute. The parties agree that "Intuitive operates its *da Vinci* robotic surgery in a *single operating room.*" Pl.'s Opp. at 12 (emphasis supplied). *See also* Declaration of John S. Wagner in Support of Defendant's Motion

("Wagner Decl.") at ¶¶ 3, 6–7. The parties disagree, however, over the proper interpretation of the claims of the '003 patent. In this case, therefore, "the question of literal infringement collapses to one of claim construction and is thus amenable to summary judgment." *Athletic Alternatives, Inc. v. Prince Mfg., Inc.,* 73 F.3d 1573, 1578 (Fed.Cir.1996).

### B. Construction of '003 Patent Claims

#### 1. Canons of Claim Construction

In order to determine the meaning of the term "remote location" in the '003 patent, this Court must engage in the process of claim construction established by the Federal Circuit in *Markman v. Westview Instruments, Inc.* and its progeny. 52 F.3d 967 (Fed.Cir.1995).

■ Claim construction is an issue of law for this Court to decide. *See, e.g., Day Int'l, Inc. v. Reeves Bros., Inc.,* 260 F.3d 1343, 1347 (Fed.Cir.2001); *Markman,* 52 F.3d at 979 ("the court has the power and obligation to construe as a matter of law the meaning of language used in a patent claim"). This Court is constrained, however, by the type of evidence it may consider when construing the claim. In this regard, the Federal Circuit has laid down several specific rules that this Court is bound to follow.

■ "It is well-settled that ... the court should look first to the intrinsic evidence of record, *i.e.,* the patent itself, including the claims, the specification, and, if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996). These three varieties of intrinsic evidence are not, however, of equal authority. *Interactive Gift Express,* 256 F.3d at 1331.

■ The analysis begins, of course, with "the words of the claims themselves."

*Id.* The "general rule" of claim construction is that "terms in the claim are to be given their ordinary and customary meaning." *K–2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1362 (Fed.Cir.1999). Moreover, "the ordinary and accustomed meaning of a disputed claim term is presumed to be the correct one," *id.* at 1362–63, and the burden is on the party asserting an extraordinary meaning of a claim to overcome this presumption. *Id.* at 1363. Finally, language used in more than one claim must be given a consistent meaning in each claim. *Phonometrics, Inc. v. Northern Telecom, Inc.*, 133 F.3d 1459, 1465 (Fed. Cir.1998).

■ There are, nevertheless, two caveats to this "plain-meaning" rule. The first caveat is that a patentee is free to "be his own lexicographer and use terms in a manner other than their ordinary meaning." *Vitronics*, 90 F.3d at 1582; *see also, e.g., In re Paulsen*, 30 F.3d 1475, 1480 (Fed.Cir.1994); *Hormone Research Found., Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1563 (Fed.Cir.1990). If a patentee intends to create new words or modify the meaning of a term, however, the idiosyncratic definition must be "clearly and deliberately stated in the intrinsic materials— the written description or the prosecution history." *K–2*, 191 F.3d at 1363; *see also Vitronics* at 1582; *In re Paulsen*, 30 F.3d 1475, 1480 (Fed.Cir.1994) (uncommon definitions used to describe an invention must be stated with "reasonable clarity, deliberateness, and precision . . . so as to give one of ordinary skill in the art notice of the change"). The second caveat comes into play when "the ordinary and accustomed meaning of a disputed term would deprive the claim of clarity." *K–2*, 191 F.3d at 1363. "In either case," however, "a party wishing to alter the meaning of a clear claim term must overcome the presumption that the ordinary and accustomed

meaning is the proper one, demonstrating why such an alteration is required." *Id.* Furthermore, if the claim language is clear on its face, then the Court's "consideration of the rest of the intrinsic evidence is restricted to determining if a deviation from the clear language of the claims is specified." *Interactive Gift Express*, 256 F.3d at 1331.

■ Next, after looking at the language of the claims themselves, the Court must look to the patent specification as a whole, because patent claims "must be read in view of the specification, of which they are a part." *Markman*, 52 F.3d at 967; *see also, e.g., Vitronics*, 90 F.3d at 1582 ("[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."). Consideration of the purpose for which the invention is designed is often useful. *See Wang Labs., Inc. v. America Online, Inc.*, 197 F.3d 1377, 1383 (Fed.Cir. 1999); *Fromson v. Anitec Printing Plates, Inc.*, 132 F.3d 1437, 1443, 1446 (Fed.Cir. 1997). Finally, the Court may also consider the "prosecution history of the patent, if in evidence." *Vitronics*, 90 F.3d at 1582.

■ At this point in the interpretive process, if "analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term[, then] it is improper to rely on extrinsic evidence." *Vitronics*, 90 F.3d at 1583; *see also, e.g., CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1318 (Fed.Cir.2000); *Robotic Vision Systems, Inc. v. View Engineering, Inc.*, 189 F.3d 1370, 1375 (Fed.Cir.1999). Extrinsic evidence may, however, be used to acquaint the Court with the general state of the art in the relevant field, so that it can interpret the technical aspects of the patent "from the vantage point of one skilled in the art." *Pitney Bowes, Inc. v. Hewlett–*

Packard Co., 182 F.3d 1298, 1309 (Fed.Cir. 1999); see also, e.g., EMI Group N. Am., Inc. v. Intel Corp., 157 F.3d 887, 892 (Fed. Cir.1998). That being said, extrinsic evidence may never be used to contradict the established meaning of the claim language as established by the intrinsic evidence. See, e.g., DeMarini Sports, Inc. v. Worth, Inc., 239 F.3d 1314, 1323 (Fed.Cir.2001); Pitney Bowes, 182 F.3d at 1309; Mantech Envtl. Corp. v. Hudson Envtl. Servs., 152 F.3d 1368, 1372 (Fed.Cir.1998).

### 2. Meaning of "Remote Location"

Following the rules laid out above, we now construe the proper meaning of "remote location beyond a range of direct manual contact," as used in the '003 patent. In this regard, it is the task of this Court to determine the meaning of "remote location" at the time Wilk filed the application that led to the '003 patent, not in hindsight. Schering Corp. v. Amgen Inc., 222 F.3d 1347, 1352 (Fed.Cir.2000).

■ The crux of the dispute between the parties is whether a "remote location beyond a range of direct manual contact" includes a location in the very same operating room as the patient being operated upon. While Brookhill maintains that this phrase does indeed include such a location, Intuitive strenuously disagrees. For the reasons that follow, we find that Intuitive has the better of the argument. Moreover, as shown below, our interpretation of this language is dispositive on the question of literal infringement.

### a. Claims

First, we look to the language of the claims themselves. The only independent claims of the '003 patent, and, thus, the only ones relevant to this inquiry, are claims 1, 10, and 17. Each of these independent claims include the following language: "transmitting [a video signal to a surgeon in] a *remote location beyond a range of direct manual contact* with [the] patient's body." '003 patent, col. 4, lines 17–21, col. 5, lines 5–9, col. 6, lines 16–21 (emphasis supplied).

In considering the "ordinary and customary" meaning of this language, see K–2, 191 F.3d at 1362, we note that Webster's defines "remote" as "separated by intervals greater than usual; far apart ... far removed; not near; far; distant." Webster's Third New Int'l Dictionary 1921 (Merriam–Webster 1993). Furthermore, this comports with the popular use of the word "remote." For example, "remote sensing" is a technique for collecting scientific data that is defined as "reconnaissance from a distance," and Remote, Oregon is a city from which "there are many lonely miles in every direction." What is Remote Sensing?, at http://www.geog.nau.edu/RemoteSensing (last modified Apr. 8, 1998); Remote Oregon—City Guide, at http://www.scod.com/cities/remote (last modified June 25, 2001). On the other hand, however, Brookhill points out that "remote," as used in a "remote control" of a television or toy vehicle, means only control "without directly touching" the object being controlled. Pl.'s Opp. at 8.

We find, as a matter of law, that the ordinary and customary meaning of "remote" is "far away" rather than "not directly touching." This lends support to Intuitive's view that a "remote location" is one that is at least as far away from the patient so as to not be in the same room as her. The '003 patent does not, however, use the single word "remote," but rather the more specific phrase, "remote location beyond a range of direct manual contact." Because a patentee is free to "be his own lexicographer," Vitronics, 90 F.3d at 1582, the relevant construction is not simply the

meaning of "remote," but rather the meaning of this phrase as a whole.

Brookhill asserts that "remote location beyond a range of direct manual contact" "means what it says." Pl.'s Opp. at 6. From Brookhill's point of view, this includes all locations "beyond arm's reach of the patient," including most of the operating room. See Pl.'s Opp. at 7, 9. This interpretation emphasizes the "direct manual contact" language. On the other side, Intuitive stresses the "range" language. Intuitive asserts that the plain meaning of this phrase is that within the "range" it defines, the surgeon has the ability to go near and touch the patient with her own hands, while outside of this "range," such "manual contact" is impossible. See Defendant's Reply to Plaintiff's Opposition to Motion for Summary Adjudication or Summary Judgment ("Def's Reply") at 5. Such a reading would exclude a location within the operating room. Id.

Both of these definitions have arguable merit. Thus, we find the meaning of this phrase is not free from ambiguity when read in isolation, so we proceed to the next stage of the analysis, and examine the specification of the '003 patent. See Bell Communications Research, Inc. v. Vitalink Communications Corp., 55 F.3d 615, 621 (Fed.Cir.1995) (because "it is legal error to construe a claim by considering it in isolation," a "claim must be read in view of the specification of which it is a part").

b. Specification

Intuitive argues that the key to understanding what is meant by "remote location" in the '003 patent is to consider its purpose, as described in the specification. Specifically, Intuitive asserts that the "single described advantage [of the '003 patent] over the prior art [is] getting the surgeon out of the operating room so that leading surgeons can operate anywhere in

the world without having to physically travel to the patient's location, thereby decreasing the cost and time required for surgery." Def.'s Mem. at 7. Therefore, Intuitive continues, the '003 patent accomplishes its purpose only if "remote location" is construed to mean a location outside the operating room. Id.

Brookhill disputes this point on two fronts. First, Brookhill maintains that the '003 patent has three stated objectives, rather than just one. These are: "1) performing surgery at reduced surgical costs; 2) further providing for surgery with endoscopic and/[or] laparoscopic equipment; and 3) facilitating the performance of operations by surgeons from all over the world." Pl.'s Opp. at 12. See also '003 patent, col. 1, lines 39–48. Second, Brookhill argues that while the specification does discuss situations in which the surgeon is outside the operating room, that is merely one example of possible uses of the '003 patent. As examples are "not claim limitations," they "should not be read into the claims." Pl.'s Opp. at 14.

As to the first of Brookhill's responses, we find that the only real and actual advantage of the '003 patent over the prior art is the facilitation of endoscopic and laparoscopic surgery by surgeons not physically present in the operating room, and possibly located hundreds or thousands of miles away. The other two claimed objects or advantages of the '003 patent are not, in fact, advantages over the prior art in any way. As to the first claimed advantage, namely the reduction of surgical costs, the '003 patent merely takes the existing art of endoscopic and laparoscopic surgery and adds several components, such as a "transmitter," two "computer[s]," and a "joy stick." '003 patent, col. 3, lines 13–22. This addition of hardware would not appear cost reductive. Rather, the only reduction in "surgical

costs" effected by the '003 patent is the elimination of the costs of patients and surgeons traveling to each other. *Id.,* col. 1, line 41. This savings is, however, encompassed by the advantage acknowledged by Intuitive.

Furthermore, Brookhill's second claimed "object" of the '003 patent merely restates the nature of the system and apparatus, namely, that it is "a method and apparatus usable with endoscopic and/or laparoscopic surgery." '003 patent, col. 1, lines 43–44. That is not a purpose or object of the '003 patent, but merely a description thereof. Thus, we are left with the only actual advantage of the '003 patent being the facilitation of remote surgery by leading surgeons at a considerable distance from their patients.

We must, however, grapple with Brookhill's second, more substantial, objection to Intuitive's use of the purpose of the system enumerated in the specification to define the '003 patent. Brookhill calls attention to, *inter alia, Comark Communications, Inc. v. Harris Corp.,* 156 F.3d 1182 (Fed.Cir.1998) to support its argument that while "the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Id.* at 1187 (internal citation and quotation marks omitted); *see also, e.g., TurboCare Div. of Demag Delaval Turbomachinery Corp. v. General Elec. Co.,* 264 F.3d 1111, 1123 (Fed.Cir. 2001) (citing *Laitram* ); *Laitram Corp. v. Cambridge Wire Cloth Co.,* 863 F.2d 855, 865 (Fed.Cir.1988) ("References to a preferred embodiment, such as those often present in a specification, are not claim limitations.").

On this issue, Brookhill is correct, but only to a point. Recent Federal Circuit opinions on this issue make clear that while the general proposition that a description of a preferred embodiment should not be read into the claims is still good law, it is not the end of the discussion. *See, e.g., Bell Atl. Network Servs., Inc. v. Covad Communications Group, Inc.,* 262 F.3d 1258, 1270 (Fed.Cir.2001) (while "mindful of the fact that limitations from the specification may not be read into the claims," holding that a preferred embodiment may be used to construe the claims); *Wang,* 197 F.3d at 1383. This is due to the fact that a patentee has at least two distinct obligations to the public under the patent statutes. The first is to describe "the invention," and the second is to "set forth the best mode contemplated by the inventor of carrying out his invention." 35 U.S.C. § 112, ¶ 1.

There are times, and Intuitive argues that this is one of them, when an enumerated "best mode" or "preferred embodiment" of an invention is, in fact, nothing more than the invention itself. *Wang,* 197 F.3d at 1383 (citing *Modine Mfg. Co. v. United States Int'l Trade Comm'n,* 75 F.3d 1545, 1551 (Fed.Cir.1996) and *General Am. Trans. Corp. v. Cryo–Trans, Inc.,* 93 F.3d 766, 770, 772 (Fed.Cir.1996)). When this occurs, it is because the patentee has, permissibly, collapsed these two independent requirements into one. Moreover, in such a case, it is proper for a construing court to read the claims as being constrained by the singular embodiment of the invention. *See, e.g., Wang,* 197 F.3d at 1383 (because the "only embodiment described in the '669 patent specification is the character-based protocol, [ ] the claims were correctly interpreted as limited thereto"); *General Am. Trans.,* 93 F.3d at 770 (where the teaching in the specification was "not just the preferred embodiment of the invention [but, rather,] the *only* one described," the district court erred by interpreting the claims

as encompassing matter beyond this sole embodiment).

We find, as a matter of claim construction, that Wilk was granted the '003 patent for a method of endoscopic or laparoscopic surgery by which the operating surgeon is located at some significant distance from the patient. This is not merely one example of a broadly useful invention, but, rather, is the only reasonable way to interpret Wilk's system, as he described it in the specification.

The specification has a consistent theme: location. For example, the '003 patent describes the then-current state of laparoscopic and endoscopic surgery. The specification notes that under traditional laparoscopic and endoscopic surgery, visual images captured by the laparoscope or endoscope may only be transmitted to "other rooms in the hospital or other institutional clinical setting." '003 patent, col. 1, lines 27–28. The '003 patent clearly contrasts this situation with the possibilities available to one using the system therein described, whereby the visual images are transmitted "to a remote location beyond a range of direct manual contact with the patient's body." *Id.*, col. 2, lines 9–10. This contrast shows that "remote location" means a location that is farther away from the patient than other rooms within the hospital would be.

Moreover, the specification notes that in traditional laparoscopic and endoscopic surgery, "the surgeon is always present in the operating room to manipulate the surgical instruments." *Id.*, col. 1, lines 30–31. In contrast, the '003 patent "enables operations to be performed by . . . surgeons who are not present in the operating room." *Id.*, col. 2, lines 18–19. This is further support for interpreting "remote location" to mean a location outside the operating room.

Finally, and perhaps most forcefully, the '003 patent states: "It is to be understood, of course, that surgeons and other personnel are present in the operating room at the time of surgery to oversee and supervise the proper operation of the equipment. These personnel may communicate with the *remote surgeon* via [a] telecommunications link." *Id.*, col. 3, lines 41–46 (emphasis supplied). This language clearly distinguishes between the local surgeons located *within* the operating room on one hand, and the "remote surgeon" located *outside* the operating room on the other hand, thus lending further support for an interpretation of "remote location" that excludes the operating room where the patient is located.

Thus, considering only the four corners of the '003 patent, we find that "remote location" is being used in its customary sense to mean "far away," and that Brookhill has not overcome the presumption that this ordinary meaning is the correct one. *See K–2,* 191 F.3d at 1363. At this stage, then, after considering the claims themselves and the specification of which they are a part, we would construe "remote location beyond a range of direct manual contact" to mean a location necessarily outside the operating room. We shall, nevertheless, complete or review of the intrinsic evidence by considering the prosecution history of the '003 patent.

### c. *Prosecution History*

As originally filed, the application for the '003 patent repeatedly used the phrase "remote location beyond a range of direct *visual* contact." Declaration of John B. Pegram in Support of Defendant's Motion for Summary Adjudication or Summary Judgment ("Pegram Decl."), Ex. 10, *passim* (emphasis supplied). The patent ex-

aminer found this phrase to be "indefinite" because "the range of direct visual contact may be different for certain operators of the system and this cannot be given weight in the claims." *Id.*, Ex. 11, at 4.

In order to overcome this indefiniteness objection, Wilk replaced this phrase with the language in dispute here, namely, "remote location beyond a range of direct *manual* contact." *Id.*, Ex. 11, at 5. Wilk's explanation of this change was that "it means that the remote location is beyond the arm's reach of the patient. Inasmuch as an arm's length is a well understood distance, it is believed that the remote location is sufficiently defined for purposes of the Patent Statute." *Id.* Brookhill points to this as evidence that being in a "remote location beyond a range of direct visual contact" with the patient is consistent with a surgeon being in the same room as the patient, and, therefore, that the '003 patent includes within its teaching a surgical system whereby the surgeon and patient are in the same operating room. Pl.'s Opp. at 10–11. Brookhill further asserts that, under the teaching of the '003 patent, a surgeon in the same room as the patient must "look at the monitor," and, thus, at that moment cannot, "be in direct visual contact with the patient." Pl.'s Opp. at 10. This argument does not withstand analysis.

First, as Intuitive points out, "if the key phrase were to require *merely* that the surgeon observe a monitor instead of the patient when operating, the prior art surgeon [using traditional endoscopic or laparoscopic surgery] would also be 'beyond the range of direct visual contact with the patient.'" Def.'s Reply at 2. Such an interpretation of Wilk's "invention" would render the '003 patent invalid for lack of novelty, because it would be no different

than the prior art of endoscopic or laparoscopic surgery. *See* 35 U.S.C. § 101 (requiring that an invention be "new" to be eligible for a patent). As the '003 patent, like all patents, is presumed to be valid, 35 U.S.C. § 282, this interpretation cannot be correct.

Furthermore, the application for the '003 patent did not say that it covered the situation where the surgeon is "beyond direct visual contact" with the patient, but rather "beyond *a range of* direct visual contact" with the patient. Pegram Decl., Ex. 10, *passim.* It is obvious that a surgeon in the same room as a patient, even at the moment that she is looking at something apart from the patient, such as a monitor, medical chart, or another surgeon, remains within the "range" of direct visual contact with the patient. The surgeon in the same room as the patient is within this range because she need only shift her gaze in order to achieve "direct visual contact" with the patient.

It is equally clear that a surgeon located in another part of the world from the patient, however, is truly "*beyond* a range of direct visual contact" with her. This is so because moving her eyes will obviously be insufficient to enable her to make "direct visual contact" with the patient. In other words, she is out of "range." In order to make "direct visual contact" with the patient, such a surgeon would have to leave her location, travel to the operating room, and look at the patient. Thus, the '003 patent only encompasses the scenario where the surgeon must travel to the patient to see her directly, and not the circumstance where the surgeon need only shift her gaze to do so.

We note that Brookhill asserts that this change in language from "direct visual contact" to "direct manual contact" did not

impermissibly add "new matter" to the application because these two phrases are consistent. Pl.'s Opp. at 19–24. *See also* 35 U.S.C. § 132. While Intuitive contests this assertion, *see* Def.'s Mem. at 13–19, for purposes of this summary judgment motion, we accept Brookhill's contention as true. We are thus operating under the assumption that this change in language worked no change in the matter claimed by the '003 patent. As we have found that the language "location beyond a range of direct visual contact" is properly construed to mean a location outside the operating room, we find that "location beyond a range of direct manual contact" has the same meaning.

Thus, this final piece of intrinsic evidence, the prosecution history, confirms our construction of the language in question. To reiterate, a "location beyond a range of direct manual contact," as used in the '003 patent, necessarily means a location outside of the operating room where the patient is located.

### C. Extrinsic Evidence

Because our analysis of the intrinsic evidence alone resolves all ambiguity in the disputed claim term, it is improper to, and we do not, consider extrinsic evidence. *Covad,* 262 F.3d at 1268–69.

### D. Comparison of '003 Patent and the da Vinci System

It is undisputed that, when using the *da Vinci* system, both the surgeon and the patient are, at all times, in the same operating room. Wagner Decl. at ¶ 7; Pl.'s Opp. at 12. As we have found that the '003 patent is limited to surgery where the surgeon is located outside the operating room, *see* Part II.B, *supra,* we find

that the *da Vinci* system does not read on any claims of the '003 patent.

### III. CONCLUSION

We grant Intuitive's motion for summary adjudication of the meaning of claim limitation "remote location." As used in the '003 patent, this term means "a location outside the operating room where the patient undergoing surgery is located." Furthermore, there is no dispute that a surgeon using the *da Vinci* system is located in the same operating room as her patient, and, thus, the *da Vinci* system does not read on the '003 patent. It follows, then, that Intuitive did not infringe that patent.

We note that Intuitive did not formally move for summary judgment on the entire case. Nevertheless, during a telephone conference with the parties held on October 15, 2001, the parties agreed that if the Court were to construe "remote location" as we have, and if the *da Vinci* system is entirely contained within the operating room, then it followed logically that summary judgment should be awarded to Intuitive. We concur, and, therefore, grant summary judgment to Intuitive dismissing the complaint. Given this conclusion, we need not and decline to address Intuitive's motion for summary judgment addressed to the alleged invalidity of the '003 patent.

**IT IS SO ORDERED.**