TURBOCARE DIVISION OF DEMAG
DELAVAL TURBOMACHINERY
CORP., Plaintiff,

v.

GENERAL ELECTRIC COMPANY,
Defendant.

No. CIV.A. 95–30069–MAP.

United States District Court,
D. Massachusetts.

Aug. 9, 2002.

Catriona Collins, Cohen, Pontani, Lieberman & Pavane, New York City, Michael J. Coyne, Bacon & Wilson, Springfield, MA, Francis J. Murphy, Lieberman & Nowak, New York City, for Plaintiff.

Christopher J. Renk, Allegretti & Witcoff, Thomas K. Pratt, Banner & Allegretti, Ltd., Mark T. Banner, Esq., Banner & Witcoff, Ltd., Chicago, IL, John P. Iwanicki, Banner & Allegretti, Ltd., Boston, MA, for Defendant.

C. Brian McDonald, Bulkley, Richardson & Gelinas, Springfield, MA, for Movant.

*MEMORANDUM REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OF NON–INFRINGEMENT AND INVALIDITY*
(Docket No. 226)

PONSOR, District Judge.

## I. *INTRODUCTION*

The plaintiff, Turbocare Division of Demag Delaval Turbomachinery Corp. ("plaintiff"), has brought suit against General Electric Co. ("defendant"), for the alleged infringement of U.S. Patent No. 4,436,311 ("the '311 patent"), which is directed to a shaft sealing system for fluid turbines. Defendant has moved for summary judgment of noninfringment and invalidity. The motion will be denied. Disputed issues of material fact prevent the court from concluding, as a matter of law, that defendant has not infringed the '311 patent under the doctrine of equivalents, or that claims 1, 5, 6, and 7 of the '311 patent are invalid.

## II. *STANDARD OF REVIEW*

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). A "genuine" issue is one that reasonably could be resolved in favor of either party, and a "material" fact is one that affects the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he district court must view 'the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor.'" *Bienkowski v. Northeastern University,* 285 F.3d 138, 140 (1st Cir.2002), *quoting Barbour v. Dynamics Research Corp.,* 63 F.3d 32, 36 (1st Cir. 1995).

The Federal Circuit has made it clear that "a district court properly may grant summary judgment on obviousness or anticipation only when the underlying factual inquiries present no lingering genuine issues." *Beckson Marine, Inc. v. NFM, Inc.,* 292 F.3d 718, 723 (Fed.Cir.2002) (citations omitted). Similarly, "[i]nfringement ... is a question of fact that a court is not to resolve on summary judgment unless no genuine factual issue remains." *Id.* at 722.

"On summary judgment, the question is not the 'weight' of the evidence, but instead the presence of a genuine issue of material fact concerning infringement." *Contessa Food Products, Inc. v. Conagra, Inc.,* 282 F.3d 1370, 1376 (Fed.Cir.2002).

### III. *FACTUAL AND PROCEDURAL BACKGROUND*

The facts in this case have been set forth at length in two related opinions by this court, *see TurboCare Div. of Demag Delaval v. General Elec.,* 938 F.Supp. 83 (D.Mass.1996), and *Turbocare Div. of Demag Delaval v. General Elec.,* 45 F.Supp.2d 110 (D.Mass.1999), and one opinion by the Federal Circuit. *Turbo-Care Div. of Demag Delaval v. General Elec.,* 264 F.3d 1111 (Fed.Cir.2001). The following summary of the facts and procedural background is tailored to the '311 patent and the issues currently before the court. Additional descriptions of the surrounding issues in the case may be found in the above cited decisions.

#### A. *The Problem of Rubbing*

The '311 patent allegedly solved a problem that had confounded manufacturers of steam turbines since at least 1927: the problem of the turbine shaft rubbing against and damaging the shaft seal. (Docket 231 at 4). In 1927, a GE employee wrote the following in a patent application:

In connection with the operation of elastic fluid turbines, it is known that when a turbine is operating at full load, it runs more smoothly and is less likely to vibrate than when running at light load. This is because a turbine when running at full load is evenly heated and is subjected to little if any temperature and pressure changes. On the other hand, when a turbine is running at light load or is being started up, it may be subject-

ed to changes in temperature and pressure of considerable magnitude and at such times is much more likely to operate unevenly or to vibrate.

(Docket 236, Exhibit G). As this early patent application describes, the vibration, or uneven running, that occurs when running a turbine at start-up or at light load can cause substantial damage to the shaft seal. The purpose of the shaft seal is to prevent steam leakage so that as much steam as possible is directed towards turning the rotor, and generating power. (Docket 238 at 2). When the teeth of the seal shaft become damaged by rubbing from the turbine shaft, an excessive clearance results between the shaft seal and the rotor. This affects the efficiency of the turbine because, put simply, too much clearance allows for too much steam leakage. *Id.* Unfortunately, the 1927 GE patent did not solve the problem of the turbine rotor rubbing against the shaft seal. Indeed, plaintiff claims, the problem went unsolved until the invention of the '311 patent. (Docket 231 at 4–5).

The '311 patent creator was Ronald Brandon ("Brandon"), who was a former GE employee. At first, Brandon attempted several unsuccessful solutions aimed at the problem of rubbing. However, he eventually,

thought of the idea of making the shaft seal movable so that it would move away from the rotor to a large clearance at start up and under low turbine loads, when damage by rubbing occurs, and to a small clearance position when the turbine reaches operating speeds, so that the efficiency of the turbine is maximized under normal operating conditions.

(Docket 238 at 3). The '311 patent arose out of this simple concept.

#### B. *The '311 Patent*

Brandon's preferred embodiment uses S-shaped compressed springs to apply a

circumferential force which biases the seal ring segments towards the large clearance position. These springs maintain a large clearance position when the turbine is running at start-up, or during low load conditions, in order to save the seal rings from becoming damaged. (Docket 227, Exhibit 2).

When the turbine accelerates, the steam pressure on the seal ring segments increases. This pressure overcomes the bias of the springs towards the large clearance position, and the seal ring segments move radially inward towards the small clearance position. Thus, when the turbine is operating at a normal operating speed, the seal becomes fixed at the low clearance position. This shift reduces the amount of steam leakage during normal operating conditions and increases the passage of steam through the nozzle. Overall, efficiency is increased by saving the seal rings from damage at low load conditions, and minimizing steam leakage during normal operating conditions when the seal rings are not jeopardized. *Id.*, Docket 238 at 3.

The '311 patent, in claim 1, claims:

In an elastic fluid turbine employing seals to minimize leakage between rotating and stationary components, an improvement in the seal arrangement utilizing the combination of:

a segmented seal ring supported by and at least partially contained in an annular groove formed in a stationary casing to permit motion of said seal ring between a large diameter position and a small diameter position corresponding respectively to large and small clearance of said seal ring with regard to the rotating shaft, said seal ring groove being partially defined by a pair of opposing, spaced apart shoulders on said casing which form an opening of said groove extending radially into the clearance area between said casing and said rotating shaft;

each segment of said seal ring including an inner arcuate portion hving [sic] seal teeth extending therefrom in the direction of and adjacent to said rotating shaft, a radially outwardly facing arcuate surface on said seal ring segment which is located opposite to a radially inward facing arcuate surface of said casing for limiting said large clearance position by contact between said opposing surfaces, an outer ring portion disposed within said seal ring groove for both axial and radial movement therein and having a pair of shoulders, extending axially in opposite directions for making radial contact respectively with said pair of spaced apart shoulders on said casing and thereby limiting said small clearance position, and a neck portion connected between said inner arcuate portion and said outer ring portion and extending between said casing shoulders, said neck portion having an axial thickness which is less than the distance between said opposing casing shoulders to thereby axially locate said seal ring segment against one of said casing shoulders and provide a contact pressure seal at the said neck portion which is subject to lower turbine fluid pressure; and

a radial positioning means comprising a compressed spring means biased against said ring segments to forcibly cause said segments to move to said large clearance position, while working fluid which is freely admitted to the annular space between said casing and said ring segments will urge said segments toward said small clearance position, whereby at low speed and small turbine loads the spring forces will predominate, while at high flows

and high working fluid pressure the pressure forces will predominate.

(Docket 227, Exhibit 2 at 5–6; United States Patent 4,436,311).[1] The '311 patent issued on March 13, 1984, and in August, 1984, Brandon was granted funds from the Department of Energy, which he used to optimize and develop his invention into a viable commercial product. (Docket 238 at 4). In November, 1984, the New York State Energy Research and Development Authority awarded Brandon additional funds. *Id.* at 4.

In 1985, Brandon approached defendant and attempted to interest it in taking license under the patent. *Id.* at 5. Brandon did not believe that he had the resources to adequately promote, manufacture, and sell his invention. *Id.* Brandon and defendant engaged in extensive negotiations between 1985 and 1987, but the negotiations were ultimately unsuccessful. *Id.* at 6.

In October, 1987, Brandon entered into a license agreement with Quabbin, Industries, Inc. ("Quabbin"), plaintiff's predecessor in interest to the patent. *Id.* To many, the '311 patent was innovative and resulted in substantial energy savings. Indeed, the Department of Energy presented Brandon with a "Special Recognition Award in the National Awards Program for Energy Innovation" in October, 1987. *Id.,* Exhibit 7. An excerpt from the National Awards Program estimated that the '311 patent resulted in "a one percent increase in efficiency and two percent increase in capacity equivalent to a savings of 19,000 barrels of oil annually." *Id.*

## C. *1992 Version & 1995 Version*

Two of defendant's products are currently accused of infringement.[2] The parties have referred to these products as the "1992 Diaphragm Version," and the "1995 Version" (together, "defendant's products"). Like the '311 patent, both products feature a large clearance position at start up and when the turbine is running at low-load capacity, and a small clearance position when the turbine is running at normal load capacity. However, defendant's products employ *flat* springs, which apply a *radial* force to bias the ring segments towards the large clearance position, rather than Brandon's S-shaped springs applying a circumferential force. Defendant's products also have drilled holes which admit steam and affect the steam path: one with a drilled hole in the seal segment itself (the 1992 Diaphragm Version), and the other with a drilled hole in the casing below the seal segment, but not in the casing shoulder (1995 Version). Finally, defendant's products include adjustable dowels interposed between the outer-ring portion of the packing and casing shoulders that allow an operator to make independent, non-uniform adjustments to the seal segments. Thus, when the products are in small clearance position, steam leakage is prevented when the dowels make contact with the casing shoulders, rather than by bringing the inward facing surface of the outer ring portion of the seal ring segment directly into contact with the outward facing surface of the casing shoulders. Defendant patented this dowel system on April 2, 1996. (Docket

---

1. Although claims 5, 6, and 7 are also subject to the current motion, the parties agree that these claims effectively stand or fall with claim 1 for purposes of the motion for summary judgment. (Docket 232 at 1).

2. As noted below, this court found, and the Federal Circuit affirmed, that the "Original Version" and the "1992–N–2 Version" do not infringe the '311 patent literally or under the doctrine of equivalents. *TurboCare Div. of Demag Delaval v. General Elec.,* 264 F.3d 1111, 1124 (Fed.Cir.2001).

227, Exhibit 5, U.S. Patent No. 5,503,405) ("the '405 patent").

## D. *Procedural History*

On April 3, 1992, defendant fired the first legal salvo. It sued Brandon in the United States District Court for the Northern District of New York, seeking a declaration that it was the true owner of the '311 patent. Defendant claimed that the '311 patent was based on the work of defendant's other employees. On December 21, 1992, District Judge Thomas J. McAvoy dismissed the action based on the statute of limitations. *General Elec. Co. v. Brandon*, No. 92–CV–0438, 1992 WL 394933 (N.D.N.Y. December 21, 1992).

Meanwhile, defendant had obtained a patent for its own version of a variable clearance packing seal system, a predecessor to the '405 patent, on March 26, 1991. As noted above, early versions of defendant's products have been referred to as the "Original Version" and the "1992 Version." After these products, defendant developed the 1992 Diaphragm Version and 1995 Version. (Docket 135 at 3).

Plaintiff brought suit alleging infringement on March 30, 1995. Defendant filed five counterclaims. In September, 1996, this court allowed plaintiff's motion for summary judgment as to defendant's counterclaims in part, leaving defendant only with its counterclaims seeking declarations of noninfringement, invalidity, and unenforceability, to the extent that those claims did not seek to reopen matters decided in the 1992 New York litigation. *See Turbo-Care*, 938 F.Supp. at 86. On March 31, 1999, this court adopted Magistrate Judge Kenneth P. Neiman's recommendation to deny defendant's motion for summary judgment on the grounds of laches and estoppel. (Dockets 135 and 148).

On August 27, 1999, this court held a hearing pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). At that hearing, the court construed the claims of the '311 patent. On October 20, 1999, defendant filed a motion for summary judgment of noninfringement on claims 1, 2, 5, 6 and 7 of the '311 patent, and of invalidity on claim 2 of the '311 patent. (Docket 183). On March 3, 1999, the court allowed defendant's motion for summary judgment. The court found (1) that all four versions of defendant's variable clearance packing seals did not infringe the '311 patent literally or under the doctrine of equivalents; and (2) that claim 2 of the '311 patent was invalid. Upon agreement of the parties, an entry of final judgment was entered on March 28, 2000. (Docket 202).

Plaintiff appealed on April 26, 2000. On August 29, 2001, the Federal Circuit affirmed in part, and vacated in part. *TurboCare Division of Demag Delaval Turbomachinery Corp. v. General Elec. Co.*, 264 F.3d 1111 (Fed.Cir.2001). In the initial section of its decision, the Federal Circuit offered guidance on the issue of claim construction. First, the Federal Circuit addressed the proper construction of the term "radial positioning means." As noted above, claim 1 provides in relevant part:

> a radial positioning means comprising a compressed spring means biased against said ring segments to forcibly cause said segments to move to said large clearance position, while working fluid which is freely admitted to the annular space between said casing and said ring segments will urge said segments toward said small clearance position, whereby at low speed and small turbine loads the spring forces will predominate, while at high flows and high working fluid pressure the pressure forces will predominate.

(Docket 227, Exhibit 2 at 5–6). Thus, the '311 patent teaches that the two clearance positions are achieved with two structures: "(1) a compressed spring means; and (2) working fluid." *TurboCare*, 264 F.3d at 1120. After analysis, the Federal Circuit found that the "compressed spring means" should not be given any special meaning, and should be broadly construed to include flat springs, a type of compressed spring. *Id.* at 1121–1122. It found that the term is not subject to Title 35, Section 112, paragraph 6, and merely "recites a particular kind of spring—a 'compressed spring.'" *Id.* at 1121. The Federal Circuit also found that,

> In accordance with Brandon's characterization of his invention in the course of the prosecution, the 'working fluid' limitation should be construed to exclude devices in which steam is admitted to the space between the casing and ring segments through a drilled hole above the ring. But that limitation should not be interpreted to exclude any device in which steam is admitted though a drilled hole, regardless of where the drilled hole is located.

*Id.* at 1123.

Next, the Federal Circuit offered guidance on the proper construction of the term, "large clearance position." As noted, claim 1 provides in relevant part:

> each segment of said seal ring including . . . a radially outwardly facing arcuate surface on said seal ring segment which is located opposite to a radially inward facing arcuate surface of said casing for limiting said large clearance position by contact between said opposing surfaces
> . . . .

(Docket 227, Exhibit 2 at 5–6). This court had adopted a fairly narrow construction of that claim, finding that in order for the seal arrangement to be in the "large clearance position," it must manifest, in effect, the preferred embodiment. Thus, this court held that the "large clearance position" required that the outward facing surface of the inner ring portion of the seal ring segment touch the inward facing surface of the casing shoulders. The Federal Circuit found this construal to be too narrow, and held that,

> While the "large clearance position" certainly encompasses the preferred embodiment, it also encompasses an arrangement in which there is contact between the outward facing surface of the outer ring portion of the seal ring segment (i.e., the top of the seal) and the inward facing surface of the casing groove.

264 F.3d at 1123.

Finally, the Federal Circuit offered guidance on the proper construction of the term "small clearance position," and in particular, its requirement of "contact." *Id.* at 1124. As noted, claim 1 provides in relevant part:

> each segment of said seal ring including . . . an outer ring portion disposed within said seal ring groove for both axial and radial movement therein and having a pair of shoulders, extending axially in opposite directions for making radial contact respectively with said pair of spaced apart shoulders on said casing and thereby limiting said small clearance position . . . .

(Docket 227, Exhibit 2). This court construed the term "contact" according to its ordinary meaning. *Id.* In other words, in the small clearance position, the inward facing surface of the outer ring portion of the seal ring segment must "touch" the outward facing surface of the casing shoulders. *Id.* The Federal Circuit affirmed this finding, and pointed out a further question that this court did not decide in its 1999 ruling: "[w]hether so-called 'indirect contact' could give rise to infringe-

ment" under the doctrine of equivalents. *Id.*

On the ultimate issues, as noted, the Federal Circuit affirmed in part and vacated in part. First, it affirmed this court's finding of invalidity as to claim 2, on the ground that it failed to satisfy the written description requirement. *Id.* at 1126. Second, the Federal Circuit affirmed this court's finding that none of defendant's products literally infringed the '311 patent. *Id.* Third, it affirmed the finding that neither the Original Version nor the 1992 Version infringed the '311 patent under the doctrine of equivalence. *Id.* Finally, it vacated the finding that, as a matter of law, the 1992 Diaphragm Version and the 1995 Version did not infringe the '311 patent under the doctrine of equivalents. *Id.* Accordingly, the Federal Circuit remanded the case to this court to determine two questions in light of its holdings and claim construction:

(1) Whether the 1992 Diaphragm Version or the 1995 Version infringes the '311 patent under the doctrine of equivalents; and

(2) Whether claims 1, 5, 6, and 7 are valid in light of the Federal Circuit's claim construction.

*Id.*

## IV. *DISCUSSION*

### A. *Doctrine of Equivalents*

■ Under the doctrine of equivalents, "a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). As the Supreme Court has recent-

ly noted, this doctrine recognizes that "the nature of language makes it impossible to capture the essence of a thing in a patent application." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki,* —— U.S. ——, ——, 122 S.Ct. 1831, 1837, 152 L.Ed.2d 944 (2002). "If patents were always interpreted by their literal terms, their value would be greatly diminished." *Id.* Accordingly, the doctrine of equivalents helps to protect inventors "from copyists who 'make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law.'" *Id.*, at 1838, *quoting Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 607, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

■ "To infringe a claim under the doctrine of equivalents, an accused device must include an equivalent for each literally absent claim limitation." *Toro Co. v. White Consol. Indus. Inc.*, 266 F.3d 1367, 1370 (Fed.Cir.2001). To make this determination, courts often apply the "insubstantial differences test," asking whether "only 'insubstantial differences' distinguish the missing claim element from the corresponding aspects of the accused device." *Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.*, 285 F.3d 1353, 1359 (Fed.Cir.2002)(quotation omitted). However, as the Supreme Court has noted, "the particular linguistic framework used is less important than whether the test is probative of the essential inquiry: Does the accused product contain elements identical or equivalent to each claimed element of the patented invention?" *Warner–Jenkinson,* 520 U.S. at 40, 117 S.Ct. 1040.

For purposes of the present motion, the sole question under the doctrine of equivalents relates to defendant's addition of the adjustment mechanism, or "dowels." As noted, the 1992 Diaphragm Version and

the 1995 Version both contain an "adjustment mechanism," or "dowels" that allow an operator to make independent, non-uniform adjustments to the seal segments. (Docket 228 at 11). As defendant points out, variations in the manufacturing process can produce non-standard or out-of-round conditions in parts such as the turbine casing and diaphragms. *Id.* Interposing adjustable dowels between the outer-ring portion of the packing and casing shoulder creates an adjustment mechanism that can correct for these non-standard conditions. *Id.* As defendant notes, the '311 patent claims no such structure that would allow for adjustment of the packing in order to provide a uniform seal and clearance in the face of non-standard or out-of-round conditions. *Id.* Thus, defendant argues that the dowel system is not only a "substantial difference" from the '311 patent, but also performs a function not claimed by the '311 patent. Defendant's products, therefore, cannot be equivalents of the '311 patent. This conclusion, defendant argues, is particularly mandated in light of the fact that defendant has patented the dowel system.

Plaintiff does not contest defendant's point that defendant's dowel system is both useful and missing from the '311 patent, but argues that the dowel adjustment mechanism is a distraction from the proper inquiry under the doctrine of equivalents. It is undisputed, as plaintiff admits, that turbine casings and diaphragms, although designed to be round, can "sometimes become distorted or 'out of round' over time or due to the installation of nonstandard parts." (Docket 231 at 17). It is further undisputed that defendant's use of dowels may correct the problem of distortion. *Id.* at 18. The '311 patent does not provide for the use of dowels, or any other such adjustment mechanism. Therefore, defendant's products contain a useful feature that is lacking in the '311 patent.

Plaintiff contends, nevertheless, that there is no substantial difference between defendant's products and the '311 patent for purposes of the doctrine of equivalents. First, plaintiff notes that "it is well established that separate patentability does not avoid equivalency as a matter of law." *Fiskars, Inc. v. Hunt Manuf. Co.*, 221 F.3d 1318, 1324 (Fed.Cir.2000), *cert. denied*, 532 U.S. 972, 121 S.Ct. 1603, 149 L.Ed.2d 469 (2001). Second, plaintiff argues that by adding the adjustment mechanism, defendant was simply "adding features" to an infringing device. *Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 837 F.2d 1044, 1057 (Fed. Cir.1988) ("Adding features to an accused device will not result in noninfringement if all the limitations in the claims, or equivalents thereof, are present in the accused device."). Plaintiff points out that,

> [I]nfringement under the doctrine of equivalents is not precluded merely because the accused device performs functions in addition to those performed by the claimed device. It is sufficient that the accused device performs substantially the same functions in substantially the same way to achieve substantially the same result as does the claimed invention.

*Insta–Foam Prods. v. Universal Foam Sys.*, 906 F.2d 698, 702 (Fed.Cir.1990); *Miles Labs., Inc. v. Shandon Inc.*, 997 F.2d 870, 877 (Fed.Cir.1993)(same). Plaintiff suggests that the adjustment mechanism simply allows defendant's products to perform a function *in addition* to those performed by the claimed device.

Put differently, defendant's mistake is in comparing the '311 patent to defendant's products, and concluding that because the '311 patent is missing an element present in defendant's products, defendant's products are not equivalents of the '311 patent. This formulation of the required

comparison incorrectly treats defendant's products—the accused devices—as the reference point. As plaintiff points out, "[i]t is the limitations and functions of the invention described in the claims, not the elements or functions of the accused device, which establish the reference point for the doctrine of equivalents analysis." *Insta–Foam,* 906 F.2d at 702.

■ With the '311 patent as the reference point, the court finds that the question of whether the 1992 Diaphragm Version and the 1995 Version "contain elements identical or equivalent to each claimed element" of the '311 patent, *Warner–Jenkinson,* 520 U.S. at 40, 117 S.Ct. 1040, necessarily hinges on disputed issues of fact that cannot be resolved at the summary judgment stage. In particular, a reasonable factfinder could conclude that achieving the small clearance position by bringing the dowels into contact with the outward facing surface of the casing shoulders is equivalent to achieving the small clearance position by bringing the inward facing surface of the outer ring portion of the seal ring segment *directly* into contact with the outward facing surface of the casing shoulders. This finding is particularly mandated in light of the fact that " '[i]nfringement under the doctrine of equivalents requires an intensely factual inquiry.' " *Toro Co.,* 266 F.3d at 1369, *quoting Vehicular Tech. Corp. v. Titan Wheel Int'l, Inc.,* 212 F.3d 1377, 1381 (Fed.Cir.2000). Given this disputed issue of material fact, plaintiff must be given its opportunity to prove infringement under the doctrine of equivalents at trial.

## B. *Invalidity*

Defendant argues for invalidity in two ways. First, defendant contends that the '311 patent was "anticipated" by a Swiss patent published in 1965. Second, defendant maintains that the '311 patent was "obvious" in light of existing patents.

### 1. *Anticipation*

■ Defendant has the burden of proving that the '311 patent was "anticipated" by clear and convincing evidence. *Beckson Marine, Inc. v. NFM, Inc.,* 292 F.3d 718, 725 (Fed.Cir.2002) ("a defendant must show invalidity by facts supported by clear and convincing evidence."). "A determination that a patent is invalid as being anticipated under 35 U.S.C. § 102 requires a finding that each and every limitation is found either expressly or inherently in a single prior art reference." *Transclean Corp. v. Bridgewood Services, Inc.,* 290 F.3d 1364, 1370 (Fed.Cir.2002). Anticipation is a question of fact, and therefore not amenable to disposition by summary judgment unless there is no genuine dispute of material fact. *Telemac Cellular Corp. v. Topp Telecom, Inc.,* 247 F.3d 1316, 1327 (Fed.Cir.2001).

Defendant attempts to meet this burden by pointing to Swiss Patent No. 387,069 (the "Doogs patent"), which was granted in 1963, and published in 1965. (Docket 227, Exhibit 7). The Doogs patent does bear a noteworthy resemblance to the '311 patent. It describes achieving an automatic and load dependent radial adjustment of sealing segments by "firstly a radially directed spring action and secondly a pressure differential directed against said spring action and varying with turbine load ...." *Id.* at 37862. This description is supplemented by a Figure, which shows a spring force acting to keep the segment away from the shaft. (Docket 227, Exhibit 7). It appears undisputed that both the Doogs patent and the '311 patent, at some level of description, contemplate spring forces interacting with pressure to keep the seal segments away from the shaft at lower

pressures, and closer to the shaft at higher pressures.

■ However, the court cannot conclude on the summary judgment record that the Doogs patent therefore "anticipates" the '311 patent, and renders it invalid. Two potentially material differences, in particular, prevent the court from concluding that "all of the elements and limitations" of the '311 patent were referenced by the Doogs patent. *Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1383 (Fed.Cir.2001).

First, the Doogs patent envisions a "floating," or variable, clearance position, while the '311 patent claims *two* clearance positions only: the "large clearance position" and the "small clearance position." As plaintiff's expert stated,

> Brandon claims two specific positions on the packing, a large clearance position and a small clearance position. This [Doogs] patent apparently does not define a specific large clearance and small clearance position except as controlled by the pressure level working against the spring. It does not move from a specific high pressure, high clearance position to a specific low clearance position. It is defined by the pressure level and the springs, but that clearance is apparently variable as a function of load, and it's a continuously variable clearance.

(Docket 233, Exhibit 28 at 177).

In response to this point, defendant points out that the Doogs patent does imply a *de facto* "large" and "small" clearance position: the total available clearance space limits how close (or how far) the seal ring segment may come to the casing shoulder. *Id.* at 184; Docket 228 at 18–19. One might say that the closest position is the "small clearance position" and the farthest position is the "large clearance position." *Id.*

This response, while colorable, is insufficient to support defendant's summary judgment motion, particularly in light of the "clear and convincing" standard. *See Karsten Mfg.*, 242 F.3d at 1384 ("Claims amenable to more than one construction should, when it is reasonably possible to do so, be construed to preserve their validity."). Indeed, plaintiff argues that defendant engages in wordplay; at bottom, the Doogs patent references a variable clearance system with numerous possible clearance positions between the largest and smallest positions, while the '311 patent claims a two-position system only.

Second, the '311 patent claims a "compressed spring," and the Doogs patent is, at a minimum, silent on the type of spring required. According to plaintiff's expert, while the Doogs patent envisions the use of a spring acting to bias the seal ring away from the shaft, that spring might easily be a tensile spring rather than a compressed spring. (Docket 233, Exhibit 28 at 187). This is also a potentially material difference between the two patents. The Federal Circuit construed the '311 patent to "recite[ ] a particular kind of spring—a 'compressed spring'," rather than "anything that performs a springing or biasing function." *TurboCare*, 264 F.3d at 1121. Thus, a reasonable factfinder could conclude that the "compressed spring" limitation was not present in the Doogs patent.

For these reasons, the court cannot conclude that defendant is entitled to summary judgment of invalidity on the ground of anticipation. Because, as defendant admitted, claims 5, 6, and 7, "stand or fall with claim 1," Docket 228 at 20, the court need not engage in a separate analysis for these claims. Defendant's motion for summary judgment of invalidity on the ground of anticipation will be denied.

## 2. *Obviousness*

■ The court similarly cannot conclude that the '311 patent is invalid on the ground of obviousness. Title 35, Section 103(a) provides that:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103(a). Defendant has the burden of proving "obviousness," like anticipation, by clear and convincing evidence. *Beckson Marine*, 292 F.3d at 725. Obviousness is a question of law premised on underlying factual determinations. *Id.* at 722 (citation omitted). "The underlying factual inquiries are: (1) the scope and content of the prior art; (2) the level of ordinary skill in the prior art; (3) the differences between the claimed invention and the prior art; and (4) objective evidence of nonobviousness." *Id.* at 725–726 (quotation omitted).

In this case, defendant argues that even if the Doogs reference does not contain every limitation claimed by the '311 patent itself, Doogs renders the '311 patent "obvious" in conjunction with at least one of two other patents: U.K. Patent No. 1,224,234 ("the Warth patent") or Swiss Patent No. 383,410 ("the Thomas patent"). (Docket 227, Exhibits 8–9). It is undisputed that the Warth patent claimed a compressed spring equivalent to the compressed spring envisioned in the '311 patent. *Id.*, Exhibit 4 at 265, 313. In addition, the Thomas patent explicitly describes a "variable radial gap" with two clearance positions: a "wide gap during turbine run-up and run-

down and ... a narrow gap during full power operation." *Id.*, Exhibit 9 at 38171. Defendant contends that these and other features of these patents in conjunction with the Doogs patent rendered the '311 patent obvious.

■ The question of whether these patents, together, made the '311 patent obvious to a person having ordinary skill in the art may be put to one side for purposes of summary judgment. When, as in this case, an obviousness defense is based on *combining* prior references, the challenger must

show a motivation to combine the references that create the case of obviousness. In other words, the challenger must show reasons that the skilled artisan, confronted with the same problems as the inventor and with no knowledge of the claimed invention, would select the elements from the cited prior art references for combination in the manner claimed.

*Beckson Marine*, 292 F.3d at 727–728, *quoting In re Rouffet*, 149 F.3d 1350, 1357 (Fed.Cir.1998). The purpose of the so-called "motivation to combine" requirement is "[t]o prevent the use of hindsight based on the invention to defeat patentability of the invention ...." *Id.* at 727.

Whether "the motivation to combine" requirement has been satisfied in this case is, at a minimum, a disputed issue of material fact. It is undisputed that prior to the invention of the '311 patent, there was no *explicit* suggestion in the technical literature, or on the face of the patents themselves, that the elements of the Doogs, Warth, or Thomas patents might be combined in such a way as to produce the '311 patent design. Certainly, there was no explicit suggestion of *how* these elements might be combined in a workable manner. Further, plaintiff's expert has testified that

the relevant claims of the '311 patent "would not have been obvious to one of ordinary skill in the art at the time of Mr. Brandon's invention." (Docket 227, Exhibit 6 at 3).

Defendant points out that "[t]he motivation to combine references need not be explicit." *Display Technologies, Inc. v. Paul Flum Ideas, Inc.*, 282 F.3d 1340, 1346–1347 (Fed.Cir.2002)(quotation omitted). However, defendant has not shown that "the nature of the problem to be solved, the teachings of the prior art, [or] the knowledge of persons of ordinary skill in the art" make the '311 patent otherwise obvious. *Beckson Marine*, 292 F.3d at 728, *quoting In re Rouffet*, 149 F.3d 1350, 1357 (Fed.Cir.1998). Given that whether a motivation to combine exists is a question of fact, and given plaintiff's submission of competent evidence showing that such a motivation to combine was lacking at the time of the invention, whether there was a motivation to combine must be treated as a disputed issue of material fact. This finding makes it unnecessary for the court to discuss whether the prior art, in combination, would have rendered the '311 patent obvious.

It is worth noting, however, that the secondary factors also weigh in plaintiff's favor on the summary judgment record. First, it is undisputed that the '311 patent has met with commercial success. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1391 (Fed.Cir.1988) ("The commercial response to an invention is significant to determinations of obviousness, and is entitled to fair weight."). Plaintiff points out that the Brandon retractable packing has been sold at two to three times the price of its conventional seal predecessors in the market. (Docket 237 at 4). Before licensing the '311 patent, Quabbin was "just a small company." *Id.* In the mid–1990's, an internal memoran-

dum by one of defendant's employees recognized that "Quabbin has perceived technological leadership in the industry." (Docket 233, Exhibit 15 at 40255). Plaintiff has submitted that, "[t]o date, Quabbin and its successors have sold over $50,000,000 worth of Brandon retractable packing." (Docket 237 at 5).

Second, it is undisputed that the '311 patent was appreciated by contemporaries skilled in the field. *Vulcan Engineering Co., Inc. v. Fata Aluminium, Inc.*, 278 F.3d 1366, 1373 (Fed.Cir.2002) ("Appreciation by contemporaries skilled in the field of the invention is a useful indicator of whether the invention would have been obvious to such persons at the time it was made."). As noted, the Department of Energy presented Brandon with a "Special Recognition Award in the National Awards Program for Energy Innovation," and estimated that the '311 patent resulted in "a one percent increase in efficiency and two percent increase in capacity equivalent to a savings of 19,000 barrels of oil annually." (Docket 238, Exhibit 7). These factors also weigh heavily against allowing defendant's motion for summary judgment. Defendant has not established on the undisputed facts that the '311 patent is invalid for obviousness.

## V. CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment of non-infringement and invalidity is hereby DENIED.

A separate order will issue.

## ORDER

For the reasons stated in the accompanying Memorandum, defendant's motion for summary judgment of non-infringement and invalidity (Docket No. 226) is hereby DENIED. The clerk will set a

date for a status conference to set a schedule for future proceedings.

It is So Ordered.